**Opinion issued October 11, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-00876-CR

———————————

**MICHAEL WAYNE CANTU, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 08-DCR-049734A**

---

## O P I N I O N

Michael Wayne Cantu appeals a conviction for murder. *See* TEX. PENAL CODE § 19.02(b)(1) (West 2011). A jury found him guilty and assessed his punishment at forty-eight years in prison. On appeal, Cantu raises three

complaints: (1) the trial judge erred by overruling his objection to the State's improper comment on Cantu's failure to testify; (2) the evidence presented at trial was legally insufficient to support a guilty verdict because the State failed to prove that Cantu intentionally or knowingly caused the victim's death; and (3) the trial court erred by admitting evidence of Cantu's previous drug use.[1]  Finding no reversible error, we affirm.

## Background

One evening in 2008, Michael Wayne Cantu returned home from a business trip to Corpus Christi.  Cantu's wife, Jackie, and his children were waiting at home.  From the time he got home until about 8:00 p.m., when the kids went to bed, Cantu spent time with his family and looked at some family pictures on his laptop in the kitchen.  After the kids went to bed, Cantu and Jackie continued to look at the pictures until about 9:00 p.m.  When Jackie returned to the kitchen around 9:30 to ask Cantu to come to bed, she discovered he was watching pornography on his computer, and the two argued.  Jackie then left in her car and returned a short while later.  It is undisputed that Jackie died in her bathroom later that night, from a gunshot wound to the head.  But, at trial, the jury heard conflicting evidence about how Jackie was shot.

---

[1]  Cantu brought four points of error, but we consider his second and third points together, because both challenge the sufficiency of the evidence.

## A. The 911 Call

The jury heard a recording of Cantu's call to 911 after Jackie was shot. On that call, an emotional Cantu told the 911 operator that his wife had shot herself and he thought she was dead. He repeated the statement and then asked the operator to send someone to save his wife. He told the operator, "We had an argument, and she grabbed the gun, and she put it in her face and she pulled the trigger." The operator asked Cantu if he was in the room when it happened, and he said, "Yes." While waiting for law enforcement to arrive, Cantu remained on the phone with the operator. He repeated several times that he and Jackie had argued, she had grabbed the gun, and it "just went off." When asked what they had been arguing over, Cantu said he could not remember. When the operator asked if they were "fighting for the gun at all," Cantu answered, "No."

## B. Cantu's Videotaped Interview

The jury also saw a video recording of an interview of Cantu on the night of Jackie's death. Cantu's explanation of how the night unfolded changed several times during the interview. First, Cantu claimed to have blacked out from the Ambien and alcohol he had consumed that night. He claimed he could not remember anything between the time he dozed off waiting for Jackie to come home and the time he found her dead. He claimed to have found her dead on the floor and assumed she killed herself.

3

Later, as Detective McKinnon, the lead investigator, continued to question him, Cantu said he assumed Jackie had shot herself, because he was not there and he "didn't see anybody else in the house. . . . . Not to say there couldn't have been somebody else in the house, but I didn't see anybody." Detective McKinnon and Cantu briefly discussed the possibility of an intruder, before Cantu ruled that out because he would necessarily have seen anyone leaving the master bathroom area—the only way out was through the living room where Cantu was.

The detectives continued to question Cantu about the night's events and insisted that he remember what happened. Cantu continued to claim for some time that he had "blacked-out" and simply did not remember. Cantu maintained that Jackie had gone to bed and, about a half-hour later, came back out. The two argued, and Jackie left in her car. Although some details varied, Cantu, during this time, continued to insist that he was not in the room when Jackie was shot.

Cantu's explanation of the night's events changed when McKinnon confronted Cantu with physical evidence showing Cantu was in the room when Jackie was shot. Specifically, crime scene investigators had found blood spatter on the right side of Cantu's torso. The blood spatter was characteristic of "high velocity" spatter or "blow back" spatter that is released from a gunshot wound. The blood spatter evidence caused Cantu to admit he was in the room when Jackie was shot. He claimed that, during the argument, Jackie had become so upset that

4

she held the gun to her head and that the gun discharged as he struggled to get the gun away from her. Cantu demonstrated what happened, indicating that the gun was approximately ten inches from Jackie's head when it discharged. Cantu explained that Jackie had, in years past, taken the same gun and threatened to kill herself during intense arguments. Cantu stated that he was unsure who pulled the trigger and that, if it was him, it was an accident.

## C. Expert Testimony

The State called three witnesses to testify about the crime scene and the physical evidence. Kim Oreskovich, an investigator with the Fort Bend County Sheriff's Office Crime Scene Unit, was one of the officers at the scene. Oreskovich took pictures and video of Jackie's body and the bathroom. Oreskovich testified that the gun was found near Jackie's right arm, pointed towards her neck. She also testified that there was not a "void" underneath the gun when she picked it up.[2] She concluded that the absence of a void indicated the gun had not naturally fallen in that position but, rather, was placed there after the pool of blood formed. Similarly, Oreskovich observed that there was "satelliting" in the pool of blood where Jackie's arm was found.[3] Oreskovich concluded that the

---

[2]  A void is a lack of evidence (in this case, blood) that is observed when an object falls or is placed on a surface before the blood flows there.

[3]  Satelliting is a pattern made when something is dropped into or otherwise disturbs a blood pool.

satteliting and patterns in the pooled blood indicated that someone had moved Jackie's right arm into the position in which it was found after the pool of blood had already formed.

The State also called Dr. Stephen Pustilnik, Chief Medical Examiner for Galveston County. Pustilnik testified that Jackie's death was inconsistent with a suicide. Pustilnik explained that there are three types of gunshot wounds: contact, intermediate, and distant. In a tight contact wound, the muzzle of the weapon is pressed against the skin, so that at the time of discharge, no gap between the muzzle and the skin exists. A tight contact discharge leaves behind a distinctive pattern, called a stellate wound. Pustilnik opined that, based on the physical evidence of the stellate splits in Jackie's wound and the lack of gunpowder on the skin around the wound, the gunshot to Jackie's head occurred with the gun pressed tightly against her skull. He also explained that the trajectory of the bullet, Jackie's hand positioning at the time of discharge, and the powder residue on Jackie's hands indicated that it was unlikely that Jackie was holding the gun when it discharged. Pustilnik also explained that the evidence was not consistent with Cantu's claim that the gun accidentally discharged as he was pulling it away from Jackie's head. According to Pustilnik, the evidence indicates that someone other than Jackie put the gun to her head and pulled the trigger. In short, Pustilnik

6

testified that the wound on Jackie's head "is not what we see when there's two people trying to control the weapon."

Tom Bevel, a forensic and crime scene expert, also testified for the State. Bevel opined that Jackie's body and the gun were "staged."[4] He agreed that the absence of a void underneath the gun indicated that the gun was placed where officers found it after Jackie fell and after the blood pooled. Additionally, Bevel testified that the evidence indicated that Jackie was not standing when she was shot as Cantu had claimed. Rather, based on blood spatter evidence, Bevel concluded that Jackie was sitting at the time she was shot.

The defense called two experts of its own to rebut the State's evidence and support Cantu's accident defense. Lawrence Renner, a forensic and crime scene analyst testified that equally-qualified experts in forensics can come to different conclusions because the conclusions depend on their training, background, and particular mind-set at the time they look at the evidence.

Cantu also called Jerome Brown, a psychologist, to address the inconsistencies in Cantu's statement to the police. Brown testified that it is possible that Cantu suffered trauma from Jackie's death. Therefore, it would be expected for him to have lapses in his memory. Brown also explained that Cantu

---

[4] Bevel explained that "staging" meant that the evidence was moved for the purpose of changing the crime scene and misdirecting the investigation.

7

may have changed his story about the events of that night or lied due to the trauma from Jackie's death.

The jury found Cantu guilty of murdering Jackie. Cantu appealed.

## Sufficiency of the Evidence

In his second and third points of error, Cantu contends that the evidence presented at trial was legally insufficient to support a guilty verdict. Specifically, Cantu argues that that the evidence was all circumstantial and the State's theory was no more believable than his own, and thus the State failed to exclude reasonable hypotheses other than his guilt. Cantu also argues that there is no evidence showing that he caused Jackie's death, or alternatively, that he did so intentionally or knowingly.

### A. Standard of review and applicable law

In determining whether the evidence is sufficient, a reviewing court views all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S. Ct. 2781, 2788–89 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). When the record supports conflicting inferences, a reviewing court must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that

8

determination. *Wise*, 364 S.W.3d at 903 (quoting *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2788–89). The fact finder determines the weight and credibility of evidence. *Id.*

The evidence-sufficiency standard of review is the same for both direct and circumstantial evidence. *Id.* (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 15 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). Likewise, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt. *Wise*, 364 S.W.3d at 903 (citing *Geesa v. State*, 820 S.W.2d 154, 156 (Tex. Crim. App. 1991)).

Ordinarily, to sustain a conviction for murder the evidence must demonstrate that the person (1) intentionally or knowingly (2) caused the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). A person acts "intentionally" or with intent with respect to the nature of his conduct or to a result of his conduct "when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a); *Wise*, 364 S.W.3d at 903. A person acts knowingly or with knowledge of the nature of his conduct or circumstances "when he is aware of the nature of his conduct or that the circumstances exist." TEX. PENAL CODE ANN. § 6.03(b); *Wise*, 364 S.W.3d at 903.

9

**B.     Analysis**

**1.     Exclusion of Other Reasonable Hypotheses**

Cantu contends that the evidence is legally insufficient because his defensive theory was as plausible as the State's theory.  Cantu argues, "It is well established that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused . . . ."  Cantu's argument is unsupported by the law.  *See Wise*, 364 S.W.3d at 903 ("For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt.").

This court recently explained:

> Before *Geesa*, in a circumstantial evidence case, the State had to exclude all reasonable hypotheses, other than the defendant's guilt, in order for the evidence to be found sufficient on appeal.  *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Crim. App. 1983), *overruled by Geesa v. State*, 820 S.W .2d 154, 161 (Tex. Crim. App. 1991).  That is no longer the State's burden.

*Damon v. State*, 01-09-01074-CR, 2011 WL 2112807, at *9 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op., not designated for publication) (citing *Geesa v. State*, 820 S.W.2d 154, 159–61 (Tex. Crim. App. 1991), *overruled in part on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000)).  Because the State did not have the burden Cantu asserts, we overrule this portion of Cantu's second and third points of error.

10

## 2. Evidence Cantu Intentionally or Knowingly Caused Jackie's Death

The jury heard Cantu describe several different versions of what transpired on the night Jackie died. In the 911 call, Cantu stated that he was in the room when she died and that they had not struggled over the gun. During his videotaped interview, he said he did not remember what happened and insisted he was not in the room when Jackie was shot. After being confronted with physical evidence demonstrating that he was in the room when Jackie was shot, Cantu said that Jackie had held the gun to her head during an argument, as she had done during previous intense arguments. Cantu said that he tried to take the gun away from Jackie and as they were struggling over the gun, it accidentally discharged.

The jury also heard testimony indicating that the physical evidence was not consistent with Cantu's contention that the shooting was accidental. Oreskovich testified that, because there was no void underneath the gun, she believed the gun did not fall naturally into the position in which Oreskovich found it, but rather, that someone placed the gun there after Jackie's blood had pooled. Oreskovich also explained that she observed blood transfer and satellite patterns indicating that Jackie's arm had been moved after she fell to the floor to the position in which it was found. Bevel, a forensic and crime scene expert, agreed with Oreskovich's findings and testified that he believed the gun and the arm were purposefully staged to mislead investigators.

11

Dr. Pustilnik, the medical examiner, testified that features of Jackie's wound indicated that the gun was pressed tightly to her head when it discharged, contradicting Cantu's demonstration during his videotaped statement of how the shooting occurred. Pustilnik also testified that the evidence—including powder residue on Jackie's hand, the angle of the bullet, and the muzzle imprint on her forehead—was inconsistent with Cantu's defensive theory that the shooting was an accident. In his opinion, the evidence was also inconsistent with the theory that the gun fired during a struggle over the gun.

Although Cantu presented expert testimony and other evidence in support of his defensive theory, the standard of review requires us to presume that the jury resolved any conflicts in favor of its verdict and to defer to the jury's determination. *See Wise*, 364 S.W.3d at 903 (citing *Jackson*, 443 U.S. at 318, 99 S. Ct. at 2788–89). Viewed in the proper light, the evidence is sufficient to support the jury's determination that Cantu intentionally or knowingly caused Jackie's death. The inconsistencies in Cantu's statements could cause a rational juror to doubt the credibility of Cantu's assertion that the gun discharged accidentally while he tried to take the gun from Jackie. Expert testimony about the evidence at the crime scene showed that Cantu had staged the evidence. And undisputed physical evidence contradicted portions of Cantu's theory that the shooting was accidental. Cantu stated and demonstrated on the video that he was pulling the gun

12

away from Jackie's head when it discharged, but the evidence showed the gun was fired with the muzzle of the gun placed against Jackie's forehead. Dr. Pustilnik also explained how other pieces of physical evidence did not support the defensive theory that the gun accidentally discharged during a struggle. From the evidence presented, the jury could have rationally concluded beyond a reasonable doubt that there was no struggle for the gun and that Cantu intentionally or knowingly caused Jackie's death. *See Howard v. State*, 484 S.W.2d 927, 928 (Tex. Crim. App. 1972) (holding evidence sufficient to support jury's verdict when physical evidence, including evidence gun was fired from a distance greater than appellant told police, was inconsistent with accidental discharge during a struggle); *see also Aldridge v. State*, No. 05-07-00777-CR, 2008 WL 3272146, at *2 (Tex. App.—Dallas Aug. 11, 2008) (mem. op., not designated for publication) (holding evidence sufficient where defendant claimed shooting was accidental and State presented contradicting testimony); *Butler v. State*, 700 S.W.2d 319, 323 (Tex. App.—San Antonio 1985, pet. ref'd) (holding evidence sufficient to support murder conviction where appellant's defensive theories of intentional or accidental self-inflicted wound occurring during struggle contradicted by physical evidence theory). Accordingly, we hold that the evidence is sufficient to support Cantu's conviction. *See Wise*, 364 S.W.3d at 903; *Howard*, 484 S.W.2d at 928.

We overrule Cantu's second and third points of error.

13

**Comment on Cantu's Failure to Testify**

In his first point of error, Cantu contends that the trial court erred by overruling his objection to the State's improper comment during closing arguments on Cantu's failure to testify.

## A. Applicable law and standard of review

This court reviews challenges to overruled objections to improper jury argument, such as an improper comment on defendant's decision not to testify, for an abuse of discretion. *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). The United States and Texas constitutions guarantee that a defendant in a criminal trial shall not be compelled to give evidence against himself. *See* U.S. CONST. amend. V; TEX. CONST. art. I. Further, the failure of any defendant to testify on his own behalf shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause. TEX. CODE CRIM. PROC. ANN. art. 38.08 (West 2005). Therefore, it is improper for the State to argue from a defendant's failure to testify. *See Bustamante v. State*, 48 S.W.3d 761, 764 (Tex. Crim. App. 2001) (citing *Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966)).

> To violate the right against self-incrimination, the offending language must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear. It is not sufficient that the language might be construed as an implied or indirect allusion. The test is whether the language used was manifestly intended or was of such a character that the jury would

14

necessarily and naturally take it as a comment on the defendant's failure to testify. In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character.

*Id.* at 765; *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007). A jury argument is improper where it calls the jury's attention to the absence of evidence that only the defendant's testimony could supply. *See Crocker v. State*, 248 S.W.3d 299, 304 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Garrett v. State*, 632 S.W.2d 350, 353 (Tex. Crim. App. 1982)).

While the State cannot comment on a defendant's failure to testify, it is permissible for the State to reference admitted statements made by the defendant. *Garcia*, 126 S.W.3d at 924. "When a defendant makes a statement which is admitted into evidence, the State's reference to the statement and comparison between the statement and the other evidence collected is not a comment on the defendant's failure to testify." *Id.* "A reference to the defendant 'not telling everything' where the prosecutor was discussing a written statement made by the defendant has been held not to be a comment on the failure to testify but a reference to the written statement." *Wolfe v. State*, 917 S.W.2d 270, 280 (Tex. Crim. App. 1996) (citing *Lopez v. State*, 339 S.W.2d 906, 910–11 (Tex. Crim. App. 1960) and holding that referring to defendant's lack of explanation in his pre-trial statement is not improper comment on failure to testify). And, in *Cruz*, the Court held the prosecutor's comments were not improper because the context of

15

the statement demonstrated that the prosecutor's statements referred to the appellant's written statement. *Cruz*, 225 S.W.3d at 549.

## B. Analysis

Cantu did not testify at trial, but recordings of his 911 call and his videotaped interview were in evidence and played for the jury. During closing arguments, the State emphasized the fact that Cantu gave various inconsistent accounts of the night of Jackie's death. The State then argued that the jury should look at all of the evidence together:

> The reasonable deduction is that [Cantu] came home that day from Corpus. They did look at photos, they were having dinner, enjoying each other's company with the family, and something went wrong. Something went wrong, and we'll never know, because he won't tell us, and what he did tell isn't true.

Cantu objected that the argument was "a comment on the defendant's failure to testify." The trial court overruled the objection and the State continued with closing argument.

Assuming this argument was an improper comment on Cantu's decision not to testify, we conclude that the trial court's failure to sustain the objection was harmless error. A prosecutorial remark that impinges upon an appellant's privilege against self-incrimination under the United States or Texas constitutions is an error of constitutional magnitude. *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). When confronted with a constitutional error, a reviewing court must

16

reverse the judgment unless it can conclude, while taking into account any and every circumstance apparent in the record, that the error did not contribute to the defendant's conviction or punishment beyond a reasonable doubt. *Id.* at 818, 822 (citing TEX. R. APP. PROC. 44.2(a)). Our primary inquiry is what effect the error had, or reasonably may have had, on the jury's decision. *Lair v. State*, 265 S.W.3d 580, 590 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). "This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution." *Id.* at 591 (quoting *Wimbrey v. State*, 106 S.W.3d 190, 192 (Tex. App.—Fort Worth 2003, pet. ref'd)).

In evaluating whether trial error of a constitutional dimension was harmful under Texas Rule of Appellate Procedure 44.2(a), we consider: the nature of the error; the extent to which it was emphasized by the State; the probable implications of the error; and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden*, 353 S.W.3d 815 at 822. These are not exclusive considerations in any particular case; many other considerations may logically serve to inform a proper harm analysis in a given case. *Id.* On the other hand, not every factor will necessarily apply to every conceivable constitutional error that may be subject to an analysis for harm. *Id.*

Under the first *Snowden* factor, we conclude that the potential gravity of the error was lessened by the fact that Cantu's statements were played for the jury.

17

Taken in context, the prosecutor's comment could reasonably be considered a reference to what Cantu did not or would not say during the 911 call or videotaped interview. As the State points out in its brief, Cantu's counsel, in his own closing argument, referred to the statements Cantu made to investigators on the night of Jackie's death as "testimony." According to the State, given the context, the jury understood the references to what Cantu said or did not say—including references from both sides—to be references to the videotaped statement, not to what Cantu said—or did not say—at trial.

Next, we examine the extent to which the State emphasized the error. *See id.* Cantu contends that the State emphasized the improper comment later in its argument when the prosecutor said: "We don't know why he did it, but we don't have to prove that. We don't know why he did it . . . We don't have to prove motive. We may never know why." To determine whether these additional comments emphasized the State's improper comment, the court must first determine whether the jury would understand the additional comments, in the context in which they were made, necessarily and naturally as comments on Cantu's failure to testify at trial. *See Snowden*, 353 S.W.3d at 824–25; *Bustamante*, 48 S.W.3d at 765; *Cruz*, 225 S.W.3d at 548. The prosecutor's later comment refers to the fact that the State is not required to prove motive, which correctly explains the State's burden of proof in the case. It therefore does not

18

necessarily and naturally refer to Cantu's failure to testify. *See Snowden*, 353 S.W.3d at 824–25 (concluding that additional comments did not emphasize State's prior comment on defendant's failure to testify because they referred solely to defendant's state of mind at the time incident occurred). We conclude the State did not emphasize the error.

Under the third and fourth *Snowden* factors, we consider the probable implication of the error and the weight the jury likely would have placed upon it. *Snowden*, 353 S.W.3d at 821. We therefore review the instructions and other relevant information the jury heard on the issue. *See Lair*, 265 S.W.3d at 592 (stating appellate court reviews entire record when evaluating potential harm). Although the trial court overruled Cantu's objection and thus did not immediately instruct the jury not to consider Cantu's decision not to testify, the jury was so instructed at other points in the trial. At the outset of the trial, during voir dire, the trial court instructed the venire that neither they nor the State could require testimony from a defendant and that a defendant's decision not to testify "cannot be considered as evidence of his guilt or taken against him in any way." The trial court followed up by asking if any venire member would go beyond the law and require Cantu to testify. No venire member raised his hand. The trial court further instructed the jury on this point immediately before closing arguments:

> In this case, the Defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact

19

throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the Defendant. If any juror starts to mention the Defendant's failure to testify in this case, then it is the duty of the other jurors to stop him at once.

At the end of Cantu's closing argument, his counsel reminded the jury of the trial court's instructions and admonishment not to hold Cantu's decision not to testify against him, imploring the jury to "listen to what the Judge told you in his instructions. . . . [P]ay attention to what the Judge tells you." Defense counsel ended his argument, and the State immediately responded: "[Defense counsel] is right. You do need to follow the law."

The jury is presumed to follow the trial court's instructions. *Lair*, 265 S.W.3d at 591 (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)). Therefore, the trial court's instructions would have mitigated the effect of the State's comment. *See id.* Cantu argues that the trial court's instructions in the jury charge were insufficient without a curative instruction made immediately after the State's improper comment. An immediate instruction, however, is not an absolute requirement. *See Jackson v. State*, No. 2-09-023-CR, 2010 WL 1509692, at *10–11 (Tex. App.—Fort Worth Apr. 15, 2010, pet. ref'd) (mem. op., not designated for publication) (finding error from improper comment during argument harmless when trial court, although overruling objection, included proper instruction addressing issue in jury charge, which was read to jury immediately before argument began); *Garrett v. State*, No. 05-08-01394-CR, 2010 WL 338202,

20

at *8 (Tex. App.—Dallas Feb. 1, 2010, pet. ref'd) (mem. op., not designated for publication) (finding harmless error where trial court improperly overruled objection to comment on defendant's failure to testify, but argument was not repeated and trial court read jury charge containing proper instruction immediately before argument); *Kraft v. State*, No. 03-04-00355-CR, 2006 WL 151935, at *12 (Tex. App.—Austin Jan. 19, 2006, pet. ref'd) (mem. op., not designated for publication) (finding harmless error where trial court overruled objection, but comment was not repeated or emphasized and jury charge correctly instructed jury concerning defendant's right not to testify). The jury was properly instructed during voir dire, immediately before argument, and in the charge. The improper comment was brief and not repeated or emphasized. Accordingly, we conclude that the impact of the State's comment was mitigated by the trial court's instructions and the jury would not have assigned the comment weight during its deliberations. *See Lair*, 265 S.W.3d at 591; *Crocker*, 248 S.W.3d at 306–07 (stating the impact of the State's improper comment was likely negated to some extent by the court's instructions during voir dire and in charge).

After review, we conclude no additional considerations other than the factors set out in *Snowden* bear on our resolution of this issue. *See Snowden*, 353 S.W.3d at 822. Because (1) the jury could have perceived the comment as a reference to Cantu's recorded statements, (2) the State did not emphasize the comment, (3) the

21

trial court instructed the jury of Cantu's right not to testify during voir dire, immediately before argument, and in the charge, and (4) the defense and State commented to the jury that it must follow the trial court's instructions regarding Cantu's decision not to testify, we are persuaded beyond a reasonable doubt that the State's improper comment regarding Cantu's failure to testify did not contribute to his conviction or punishment. *See id.* at 818; *Lair*, 265 S.W.3d at 591; *Crocker*, 248 S.W.3d at 306; *Lozano*, 2010 WL 150975, at *2.

We overrule Cantu's first point of error.

### Admissibility of Evidence of Cantu's Prior Drug Use

In his fourth point of error, Cantu contends that the trial court erred by admitting evidence of his previous drug use.

### A. Standard of Review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Burke v. State*, 371 S.W.3d 252, 258 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd, untimely filed) (citing *Page v. State*, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006)). A trial court abuses its discretion when its ruling is arbitrary or unreasonable. *Id.* (citing *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005)). A trial court does not commit an abuse its discretion if its decision is within "the zone of reasonable disagreement." *Id.* (quoting *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008)).

## B.    Applicable law

Under most circumstances, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b).  Courts have consistently concluded that such evidence is inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not present in the case against him. *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008).  However, Rule 404(b) allows such evidence of other crimes, wrongs, or acts if the evidence has relevance apart from character conformity.  *See* TEX. R. EVID. 404(b); *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).  Rebuttal of a defensive theory is one of the permissible purposes for which evidence may be admitted under Rule 404(b).  *Moses*, 105 S.W.3d at 626; *Albrecht*, 486 S.W.2d at 101; *Garrett v. State*, 998 S.W.2d 307, 316 (Tex. App.—Texarkana 1999, pet. ref'd) (holding extraneous evidence that defendant was using drugs admissible under Rule 404(b) because evidence not offered to show that defendant was drug user and was using drugs at the time of the offense, but to rebut the defense of consensual sex).  In determining whether extraneous-offense evidence is admissible to rebut a defensive theory, a trial court can consider a defensive theory raised by defense counsel in an opening statement.  *Powell v. State*, 63 S.W.3d 435, 438–39 (Tex. Crim. App. 2001).

## C.      Relevant Facts

During opening statements, Cantu's counsel told the jury that Cantu and Jackie had previously had intense arguments.  He explained that during these fights, Jackie placed the gun to her head and threatened to kill herself.  Cantu's defensive theory was that Jackie had placed the gun to her head on the night of her death, just like she had on previous occasions.  However, Cantu's counsel did not explain that Cantu's drug use had led to their altercations  on those prior occasions.  To rebut Cantu's defensive theory, the State attempted to show that this incident was different from the earlier incidents in which Jackie held a gun to her head because Cantu was not on drugs on the night of Jackie's death.

The trial court found that because Cantu himself told the jury about the incidents in which Jackie had held a gun to her head, the State was entitled to introduce evidence showing that this incident was different, namely, it did not involve Cantu's drug use.  The State played the video of Cantu's interview to the jury.  In it, Cantu explained that Jackie had put the gun to her head and threatened to kill herself in the past.  When the detectives questioned him further, Cantu admitted that the suicide threats occurred during fights about his drug problem, which, he told detectives, he no longer had.  Cantu timely objected under Rule 404(b).  The trial court overruled the objection and instructed the jury:

> Ladies and gentlemen of the jury, I'm admitting certain evidence concerning  drug use by the Defendant, which is evidence that is

24

being admitted only to show other purposes, such as proof of motive, opportunity, preparation or absence of mistake or accident. I instruct you to consider this evidence only as evidence to show. . . intent, as proffered by the State, not as any proof that he is guilty of the charged crime.

The next time Cantu mentioned his drug use problem in the video statement Cantu timely objected, and the court granted a running 404(b) objection to the extraneous evidence regarding Cantu's previous drug use.

## D.   Analysis

Cantu's defense included informing the jury that Jackie had, during past arguments, taken a gun and placed it to her head. The State attempted to rebut that defensive theory by showing that the previous fights were over Cantu's drug use and this incident was different because the drug test taken after Jackie's death showed Cantu was not on drugs. The State's evidence of Cantu's previous drug use generally would be inadmissible under Rule 404(b), but because the State used it to rebut Cantu's defensive theory, we conclude that the trial court did not abuse its discretion in finding the evidence admissible. *See* TEX. R. EVID. 404(a), (b); *Moses*, 105 S.W.3d at 626 (holding trial court did not abuse its discretion in its admitting extraneous evidence to rebut a defensive theory); *Albrecht*, 486 S.W.2d at 100 ("Probably the most common situation which gives rise to the admission of extraneous offenses is in rebuttal to a defensive theory"); *Garret*, 998 S.W.2d at

316 (evidence of defendant's drug use admissible because offered to rebut defensive theory).

Cantu also argues that the extraneous evidence is inadmissible because it is simply background evidence. *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991). Citing *Mayes*, he observes: "[C]haracter evidence offered on the rationale that it is background evidence helpful to a jury, but apparently in conflict with the proscription of Rule 404(b), is not admissible as one of the alternative purposes such evidence may be introduced under Rule 404(b)." *Id.* In *Mayes* however, there was no defensive theory being submitted. *Mayes* does not control this case because the extraneous evidence was not proffered simply as background evidence, but rather to rebut Cantu's defensive theory. *See Moses*, 105 S.W.3d at 626; *Albrecht*, 486 S.W.2d at 100; *Garret*, 998 S.W.2d at 316. The trial court in this case did not abuse its discretion in admitting evidence regarding Cantu's previous drug use. *See* TEX. R. EVID. 404(a), (b); *Moses*, 105 S.W.3d at 625–26; *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Albrecht*, 486 S.W.2d at 100; *Garrett*, 998 S.W.2d at 316.

We overrule Cantu's fourth point of error.

## Conclusion

We affirm the judgment of the trial court.

Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.

Publish.   TEX. R. APP. P. 47.2(b).