**Opinion issued June 17, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00440-CR

———————————

**DARREL WAYNE BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1487463**

---

## MEMORANDUM OPINION

A jury found appellant, Darrel Wayne Brown, guilty of the felony offense of

continuous sexual abuse of a child[1] and assessed his punishment at confinement for

---

[1]     *See* TEX. PENAL CODE ANN. § 21.02.

life. In two issues, appellant contends that the evidence is legally insufficient to support his conviction and the trial court erred in admitting certain evidence.

We affirm.

## Background

The complainant, who was born in November 2011, testified that she remembered appellant sexually abusing her when she was nine years old and in the sixth grade, during the period of time "from the very beginning of December or the ending of November to the beginning of January," at appellant's house in Hockley, Texas. The house was on a cul-de-sac, and appellant lived there for about two years. The complainant and her family lived down the street from appellant and his family. Appellant was living with the complainant's mother's younger sister and their children, and the complainant's family and appellant's family would frequently spend time together. The complainant testified that she would visit appellant's home "during the week or during the weekends," and she agreed that if she visited the home on a weekday, then it would have been during the Christmas holidays.

The first incident of sexual abuse occurred "in November or December" while the complainant was "on Christmas break" from school. On the day of the first incident of sexual abuse, the complainant was visiting appellant's home, "talking to [her] cousins [and] playing the [Nintendo] Wii [gaming system]." Sometimes appellant would have her help clean the house and would pay her for her work. He

2

asked her to help that day, so she went upstairs while everyone else stayed downstairs watching television and talking. The complainant went into the master bedroom "looking for the cleaning supplies." She turned around and "saw him" follow her into the room and "lock the door." Appellant "told [her] to get on the bed." The next thing she remembered was that her pants and underwear were off, and she was on her back. Appellant "did penetration" by putting his penis into her vagina. The complainant could not recall how long the sexual abuse went on, but eventually, someone knocked on the bedroom door. Appellant "hurried and put his clothes back on, and [the complainant] put [her] clothes back on." As they dressed, appellant told the complainant "that it was [their] secret, and [she] couldn't tell anyone." Then appellant "opened the door, and [the complainant] walked out of the room and went downstairs and sat on the couch." She did not tell anyone about what had happened; she "just wanted to go home."

After that first incident of sexual abuse, appellant would abuse the complainant anytime she went over to appellant's house. And that occurred "pretty frequent[ly] because [appellant and his family] lived just down the street" from the complainant's home. According to the complainant, she and her mother would go over to appellant's house to visit his family about once a week.

The complainant recalled that the next incident of sexual abuse by appellant took place about two weeks after the first incident, when appellant invited her to

3

accompany him to pick up some food at Sonic Drive-In restaurant near appellant's home. She "remember[ed] trying to sit in the back[]seat, but [appellant] . . . encouraged [her] to sit in the front seat" of appellant's car. "[O]n the way there, [appellant] . . . positioned his hand between [the complainant's] legs," inside her underwear, "while he was ordering the food and the drinks for the family" in the drive-through lane. Appellant moved his hand around, touching her labia and inside her vagina. He "removed his hand" when they reached the drive-through window. When the order arrived, the complainant put her "slushy" iced drink between her legs "[s]o [appellant] didn't put his hand there anymore."

The complainant testified that incidents of sexual abuse by appellant through penetration occurred "five or six times" that winter. Each time, appellant would have the complainant help him clean the second floor of his house, and he would penetrate her vagina with his penis while they were upstairs. When asked to clarify if the incidents of sexual abuse occurred "over the course of more than [thirty] days," the complainant responded, "Yes." The complainant also stated that the sexual abuse occurred "[o]ver a period of maybe three months." When asked if the time frame "[c]ould . . . have been shorter than that," the complainant responded, "No."

The complainant also explained that at other times, appellant "would pick her up wrong, or he would put his hand in places where it shouldn't [have] be[en]." For example, sometimes appellant picked her up by putting his hand under "vagina[l]

4

area," or he "would reach his hand" over her clothes to touch her vaginal area. And once, appellant "put [the complainant] on the bed" and "told [her] to touch his penis." She "strongly tried to fight back from him pulling [her] hand to his penis." She "could tell he was angry" because she was resisting, "but he didn't show any signs of aggression towards physically hurting [her]."

After one incident of sexual abuse by penetration, the complainant's "mother discovered there was blood in [the complainant's] underwear" when they returned home. The complainant did not tell her mother anything, and her mother "assumed that maybe [the complainant] was getting [her] period early." Her mother took her to the doctor, but the complainant did not tell the doctor about the sexual abuse.

Eventually, the complainant began to avoid visiting appellant's house. When her mother wanted to visit her younger sister, the complainant "would tell her that [she] didn't feel good or [she] was ill or something that would help [her] stay home."

Several years later, the complainant celebrated the high school graduation of the complainant's cousin, who was also appellant's son. She did not know that appellant would be at the celebration, and she was upset when she saw him. At the graduation party for her cousin, the complainant "tried [her] best to keep away from [appellant]. . . . If [appellant] was outside with some family, [she] would go inside. If he was inside with some family, [she] would go outside." At one point during the party, "while everybody was outside talking," appellant went up to the complainant

5

and "gave her money for some reason. He gave [her] about $60 that night, but [she] didn't want it," so she gave it to her mother. Appellant did not say why he was giving her money, but she "pretty much . . . knew what it was for."

Heather Stautmeister, a licensed therapist with Family Ties Family Resource Services Family Crisis Center in Waller, Texas, testified that her first appointment with the complainant was on May 20, 2015. The complainant's mother scheduled the appointment after contacting the Center and "stating that her daughter was isolating and appeared depressed and had cut—had been cutting." At the first counseling session, the complainant stated that her mother had wanted her to have counseling because she had cut herself. In these circumstances, Stautmeister explained, she has a pattern she typically uses of asking the child if she knows why she is self-harming and, if the child expresses that she does not know, Stautmeister mentions that "if someone is hurt by another person or they're experiencing a trauma, they might cut." And then she asks, "Is that the case for you?" When Stautmeister posed this question to the complainant, she responded, "How did you know?" When Stautmeister asked the complainant if she would share what had happened to her, the complainant would not disclose what had happened or who had harmed her, but she did tell Stautmeister that she was no longer in contact with the person who harmed her.

In the second counseling session with the complainant, the complainant was still unwilling to share any details about her trauma. The third session took place on June 11, 2015. That day, the complainant "came in; she was very nervous; she already had tears in her eyes; and she said that she was ready to talk about it." "She shared with [Stautmeister] that she had recently attended her cousin's high school graduation" and graduation party, and "that [appellant], the father of the [complainant's cousin], was there and that he had attempted to approach her and even give her money and she thought that she could avoid him at this event but she was unable to do that." The complainant told Stautmeister "that [appellant] had touched her in her private areas, and . . . that he had used his fingers to go inside her and further stated that he had also [gone] inside with his penis," and that these incidents of sexual abuse had happened "multiple times." The complainant described one incident of sexual abuse to Stautmeister in which appellant had encouraged her to come from the back seat of his car into the front seat as well as other sexual abuse incidents that had occurred "in an upstairs bedroom" of appellant's home where he was living with the complainant's mother's younger sister, "even though [the younger sister] and [appellant] were separated."

Stautmeister explained that her notes from the counseling sessions were taken near the time of her counseling sessions with the complainant and they reflected that the complainant told Stautmeister that she was eight or nine years old when appellant

7

sexually abused her. The trial court admitted into evidence copies of Stautmeister's records from her counseling sessions with the complainant. Stautmeister stated, based on her professional experience, that "it [was] typical that [children] w[ould] not be able to pinpoint a time—a specific time and date" of when each incident of sexual abuse occurred, because "[t]ime is different . . . developmentally as [people] grow."

After the complainant's disclosure, Stautmeister informed the complainant that she would have to tell law enforcement about the sexual abuse. Stautmeister asked the complainant if she wanted to tell her parents herself, but the complainant asked Stautmeister to do so.

The complainant's mother testified that appellant is her youngest sister's ex-husband, whom her younger sister divorced about fifteen years ago. Appellant and the younger sister had three sons. The complainant's mother had a close relationship with her nephews, referring to them as "[her] hearts." After the complainant was born, the complainant's family and the younger sister's family were so close that the complainant considered her cousins to be "like her brothers." The complainant would cry if someone said "that she didn't have siblings." The complainant's mother and younger sister were also very close, and they "never lived more than five, ten minutes apart from one another." When the complainant was

between eight and ten years old, her family lived in Hockley. The younger sister's family, including appellant, also lived in Hockley.

The complainant's mother noticed that the complainant's behavior began changing "when she was in . . . [j]unior [h]igh [school]," during seventh grade. Although at this time, the younger sister and appellant were divorced, appellant still participated in larger family gatherings. The complainant was "withdrawn." She "would spend most of her time in her bedroom" and was "not as active as she would normally be." The complainant's mother "couldn't get [the complainant] to eat," and "she really was starting to drop some weight." The complainant's mother spoke with the junior high school assistant principal, who informed her that "they w[ere] noticing some things with her at school, as well." The assistant principal had been bringing the complainant to her office at lunch to make sure she would eat.

According to the complainant's mother, some nights, the complainant "did not sleep." The complainant's mother "would get up and . . . go check" and the complainant "w[ould] still be up." The complainant's mother also noticed that the complainant was "always wearing long sleeves," even when the weather was hot. One day when the complainant's mother was driving the complainant to school, she noticed that the complainant had rolled up her shirt sleeves and saw "all these marks on her arms" from "cutting." The complainant responded, "It's nothing, Mom," and hurriedly pulled her sleeves down. The complainant would "not tell [her mother]

9

what was bothering her." Around this same time, the complainant's mother "would find" her large kitchen knives "underneath" and "in between the mattresses" of the complainant's bed.

The junior high school assistant principal gave the complainant's mother a referral to a family counseling agency. The complainant's mother made an appointment and the complainant started counseling. In 2015, shortly after the complainant began counseling, one of her cousins, who was appellant's son, had his high school graduation. "The [complainant's] family," including the complainant's extended family, "all got together" and "went to the . . . graduation." As the complainant's mother and the complainant walked through the parking lot to the auditorium where the graduation ceremony was to be held, the complainant's mother saw appellant approaching them from the side and greeted appellant. At that point, the complainant "bolted." The complainant's mother went after her and "remember[ed] being upset with her because she left all of the family, and [she and the complainant] were . . . separated [from the rest of the family] within the auditorium." But the complainant's mother "just could not get [the complainant] to [sit] with the rest of the family."

After the graduation ceremony, the complainant's extended family, including appellant, gathered for a graduation party "at [the complainant's mother's] oldest sister's house." But even though "the majority of the party was outside," the

complainant "was inside." The complainant "went into the house" and "didn't mingle with everyone." She came outside only once to plead with the complainant's mother saying, "Momma, please, let's go home. Let's go home."

The complainant's father testified that the complainant was a "[b]ubbly, very outgoing person, quiet at times, [who] love[d] to read, [and who was] very interested in animals." He noticed that the complainant's behavior changed when she was about ten years old. She became more withdrawn and "needy." For example, although the complainant "used to like to be by herself" in a room, "it got to a point to where she would start calling [her father]" while he was at work, "wanting to know where [he] was, . . . what time [he] was coming home, and how long was it going to take [him] to get there." Also, "[s]he would have nightmares" and would sleep on the floor in her parents' bedroom. According to the complainant's father, such behavior was unusual because the complainant was "not a timid child" and had never been "scared to be by herself."

At the high school graduation ceremony for the complainant's cousin, "[the complainant] clung to [her father]." "She put her arm in [her father's] arm and didn't let go. She walked step by step with [her father] the entire time." The complainant's father also attended the graduation party for the complainant's cousin, but he arrived late because of work. "[W]hile [he] was on [his] way there, [the complainant] called [him] on her cell phone and asked [him] how close [he] was." He responded,

11

"Daddy's about [five] miles out from you." She then asked him, "Well, how quick can you get here? . . . I need you now." The complainant's father asked, "Is something going on?" and the complainant replied, "No, I just need you to get here now." When the complainant's father arrived, the complainant "went straight to [him] . . . and put her arms in [his] arm; and that's where she pretty much stayed the whole time [they] were [at the party]." And the complainant's father "said to [him]self, something happened . . . . Something caused her to be that way."

C.D. testified that she is appellant's cousin. When she was five years old and appellant was nineteen years old, appellant "used to . . . babysit" her and another female cousin close to her age after they got home from school, while C.D.'s mother was at work. Appellant "did inappropriate things to [C.D. and her cousin]." "He would touch [her] all the time" in "[her] vagina" with "his penis." "He would make [her] put [a] pillow over" her face. "He tried" to put his penis inside her vagina, "but it was painful, of course, because [she] was young." C.D.'s female cousin eventually told C.D.'s mother about the sexual abuse because appellant "was hurting" them.

Years later, when C.D. was an adult, she ran into appellant at a Subway restaurant. "[H]e stopped [her]" and "said that he wanted to apologize for what he did to [her] a long time ago . . . ." C.D. did not respond.

12

Blanca Avilez, a latent fingerprint examiner with the Harris County Sheriff's Office Crime Scene Unit, testified that she had taken appellant's fingerprints on the day of trial and compared those prints to the fingerprints on State's Exhibit 12,[2] a copy of appellant's penitentiary packet from the Texas Department of Criminal Justice related to his two previous convictions for the offense of indecency with a child. Avilez concluded that both sets of fingerprints came from the same person and confirmed that State's Exhibit 12 pertained to appellant. The penitentiary packet contained the judgments for two separate convictions for the offense of indecency with a child. The judgments show that on March 11, 1985, appellant pleaded no contest to two offenses of indecency with a child and punishment was assessed at confinement for five years for each offense, to run concurrently.

Appellant testified that he pleaded no contest to the 1985 offenses of indecency with a child, his punishment was assessed at confinement for five years, and he was incarcerated for about three years. Appellant nevertheless denied, despite his convictions, that he had any inappropriate contact with C.D. And he also denied that he sexually abused the complainant.

---

[2] The trial court admitted State's Exhibit 12 into evidence.

## Sufficiency of Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because no rational trier of fact could have found that he committed the offense of continuous sexual abuse of a child within the dates specified in the indictment, as the dates established by witnesses' testimony at trial are outside the time frame alleged in the indictment.

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

In reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, and any reasonable inferences that may be drawn

from the evidence.  *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence).  Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt.  *See Wise*, 364 S.W.3d at 903; *see also Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd).  Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict.  *Wise*, 364 S.W.3d at 903; *Hooper,* 214 S.W.3d at 13.  The jury, as the judge of the facts and the credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony.  *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of continuous sexual abuse of a child if, during a period that is thirty or more days in duration, he commits two or more acts of sexual abuse, and, at the time of the commission of each of the acts, he is seventeen years

of age or older and the complainant is a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 21.02(b)(1), (2). An "act of sexual abuse" includes sexual assault, aggravated sexual assault, sexual performance by a child, and indecency with a child other than by touching the breast of a child. *Id.* § 21.02(c).

A jury is "not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant" or "the exact date when those acts were committed"; they must only agree that "the defendant, during a period that is [thirty] or more days in duration, committed two or more acts of sexual abuse." *Id.* § 21.02(d); *see Smith v. State*, 340 S.W.3d 41, 48 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Appellant does not accurately characterize the complainant's testimony in asserting that the record shows that the incidents of sexual abuse occurred within less than the thirty-day time period required by the statute and outside of the time frame alleged in the indictment. The indictment in this case alleged:

> [O]n or about November 13, 2009 through November 14, 2010, [appellant] did then and there unlawfully, during a period of time of thirty or more days in duration, commit at least two acts of sexual abuse against a child younger than fourteen years of age, including an act constituting the offence of indecency with a child by contact, committed against [the complainant] on or about November 13, 2009, and an act constituting the offence of indecency with a child by contact, committed against [the complainant] on or about November 13, 2010, and [appellant] was at least seventeen years of age at the time of commission of each of those acts.

16

The complainant testified that the various incidents of sexual abuse by appellant occurred "from the very beginning of December or the ending of November to the beginning of January." And the complainant testified that the incidents of sexual abuse by appellant through penetration occurred "five or six times" that winter. The complainant also testified that she would visit appellant's home about every week either "during the week or during the weekends," and she agreed that if she visited the home on a weekday, then it would have been during the Christmas holidays. Additionally, she stated that the first incident of sexual abuse occurred "in November or December," while she was "on Christmas break" from school. The complainant did not remember precisely how long appellant lived at that house on the cul-de-sac in Hockley, but she thought it was for about two years. When asked to clarify if the incidents of sexual abuse committed by appellant occurred "over the course of more than [thirty] days," the complainant responded, "Yes." Also, the complainant stated that the sexual abuse occurred "[o]ver a period of maybe three months." When asked if the time frame "[c]ould . . . have been shorter than that," the complainant responded, "No."

As for appellant's assertion that the evidence shows that his sexual abuse of the complainant occurred outside of the time frame alleged in the indictment, the Texas Court of Criminal Appeals has held that "the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the

17

indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997). Generally, "the primary purpose of specifying a date in an indictment is to show that prosecution is not barred by a statute of limitations," but there is no statute of limitations for the offenses of continuous sexual abuse of a child and indecency with a child. *Smith*, 340 S.W.3d at 48; *see* TEX. CODE CRIM. PROC. ANN. art. 12.01(1)(D).

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the incidents of sexual abuse committed by appellant against the complainant occurred over a time period of at least thirty days in duration and before the presentment of the indictment. We therefore hold that the evidence is legally sufficient to support appellant's conviction for the offense of continuous sexual abuse of a child.

We overrule appellant's first issue.

### Extraneous Offense Evidence

In his second issue, appellant argues that the trial court erred in admitting the testimony of C.D. about appellant's indecent contact with her when she was five years old because the trial court misapplied Texas Code of Criminal Procedure Article 38.37, section 2(b) and Texas Rule of Evidence 403.

A trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court's decision to admit evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018); *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996). A trial court's ruling on the admission of extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling, even if the trial court gives the wrong reason for the right ruling. *Id*.

"An extraneous offense is any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (internal quotations omitted).

19

Generally, Texas Rule of Evidence 404(b) prohibits the admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. *See* TEX. R. EVID. 404(b). When a defendant is being prosecuted for the offense of continuous sexual abuse of a child, though, evidence that the defendant has committed one or more of the enumerated sexual offenses against a child, including the offense of indecency with a child, "may be admitted . . . for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2; *see also Jeansonne v. State*, No. 01-19-00583-CR, --- S.W.3d ---, 2021 WL 1537653, at *13 (Tex. App.—Houston [1st Dist.] Apr. 20, 2021, no pet.) ("Essentially, article 38.37 is an evidentiary rule applicable to certain types of sexual abuse cases . . . that supersedes the application of Texas Rule of Evidence 404(b), and makes admissible certain extraneous offense evidence that [r]ule 404(b) does not."); *Belcher v. State*, 474 S.W.3d 840, 844 (Tex. App.—Tyler 2015, no pet.) (article 38.37, section 2(b) allows admission of evidence that defendant had previously committed certain sexual offenses against non-victims of charged offense).

Still, even if extraneous offense evidence is admissible under Texas Code of Criminal Procedure article 38.37, a trial court has a nondiscretionary obligation to weigh the probative value of the evidence against any unfair prejudice of its

admission when, as here, a defendant objects to the admission of extraneous offense evidence based on Texas Rule of Evidence 403. *Allen v. State*, 01-13-00784-CR, 2015 WL 5076288, at \*9 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication); *Martines v. State*, 371 S.W.3d 232, 246–47 (Tex. App.—Houston [1st Dist.] 2011, no pet.). When conducting a rule 403 analysis, a trial court must balance the probative force of and the proponent's need for the evidence against (1) any tendency of the evidence to suggest decision on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will amount to undue delay. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Gorman v. State*, No. 01-18-00316-CR, 2019 WL 610739, \*5 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, no pet.) (mem. op., not designated for publication). A rule 403 analysis favors admissibility of relevant evidence, and a trial court's conclusion that the danger of unfair prejudice does not substantially outweigh the evidence's probative value is entitled to deference. *See Wilson v. State*, 473 S.W.3d 889, 900 (Tex. App.—Houston [1st Dist.] Aug. 25, 2015, pet. ref'd).

Appellant argues that the trial court erred in conducting its rule 403 balancing test because the evidence of his convictions for the offense of indecency with a child

21

perpetrated against C.D., which occurred more than thirty years before his sexual abuse of the complainant, was too remote in time to have any probative value. And appellant asserts that C.D.'s testimony "offered nothing to prove the case at hand." We disagree.

C.D.'s testimony described appellant, who was an adult at the time, having indecent contact with a much-younger, prepubescent, female family member through penetration or attempted penetration of her vagina with his penis, and the incidents of indecency with a child happened on multiple occasions. This testimony describes conduct by appellant that is substantially similar to the conduct by appellant that the complainant testified about. Evidence that a defendant has sexually abused another child is relevant to whether the defendant sexually abused the child-complainant in the charged case. *Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Alvarez v. State*, 491 S.W.3d 362, 371 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) ("Because the evidence of prior sexual abuse of children was especially probative of [the defendant's] propensity to sexually assault children, the [r]ule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children." (internal quotations omitted)). And, because appellant's cross-examination of the complainant brought the veracity of her testimony about the sexual abuse by appellant into issue and appellant denied sexually abusing the

complainant, C.D.'s testimony was also relevant because it tended to show a lack of fabrication by the complainant.

Appellant also asserts that C.D.'s testimony likely confused and distracted the jury, but this assertion disregards the limiting instruction that the trial court gave before C.D. testified. *See Harris v. State*, 475 S.W.3d 395, 403 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). Specifically, the trial court instructed the jury:

> [I]f there is any evidence before you concerning alleged offenses against a child under 17 years of age other than the complainant alleged in the indictment, such offense or offenses, if any, may only be considered if you believe beyond a reasonable doubt that [appellant] committed such other offense or offenses, if any, then you may consider said evidence for the bearing the evidence has on the relevant matters, including the character of [appellant] and acts performed in conformity with the character of [appellant].

This instruction was also included in the trial court's charge to the jury. We presume that the jury followed the trial court's instructions, which mitigated the possibility of confusion or distraction. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

We hold that the trial court did not err in admitting C.D.'s testimony as extraneous offense evidence.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice


Panel consists of Justices Kelly, Goodman, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).

24