**Opinion issued March 26, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-23-00576-CR**

————————————

**JUAN VILLANUEVA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1732427**

---

## MEMORANDUM OPINION

Appellant Juan Villanueva pled guilty to the second-degree felony of sexual assault of a child.[1]  A jury assessed his punishment at seventeen years' confinement and a $10,000 fine.

---

[1]     *See* TEX. PENAL CODE § 22.011(a)(2), (f).

In his sole issue on appeal, he argues the trial court denied him his right to counsel by disallowing him to state during closing argument that, given his conviction, he would have to register for life as a sex offender. Finding no reversible error, we affirm.

## Background

Villanueva and Mary[2] engaged in a sexual relationship from May 2020 through June 2021. When they began the sexual relationship, Mary was fourteen years old and Villanueva was twenty-seven years old.[3] In July 2021, Mother came home from work to find Villanueva in Mary's bedroom. Mother called the police and detained Villanueva until the police arrived. Villanueva was arrested and indicted for sexual assault of a child. He pled guilty and elected to have the jury assess punishment.

## The Trial

### A. The Witnesses

The State called three witnesses during the punishment phase of trial and Villanueva called four witnesses. Villanueva testified on his own behalf.

---

[2]    Because she was a minor when the assaults occurred, we use pseudonyms to protect the identity of the complainant. We refer to the complainant as "Mary" and to her mother as "Mother."

[3]    According to Mary, she met Villanueva when she was thirteen years old.

2

### 1. Mother

Mother testified that she and Villanueva were neighbors at the trailer park where they lived. She became suspicious when she noticed that her daughter, Mary, was having conversations with Villanueva. Because of Mother's suspicions, they moved, but Villanueva came to their new address to see Mary. Mother testified that while she was at work, Villanueva took her three children and his three children on outings without her permission. Mother tried to prevent Villanueva from seeing Mary for "[a] little over two years." Mother testified that Villanueva sometimes took Mary out at night while Mother was sleeping. According to Mother, she called the police, but nothing was done to stop Villanueva's visits. The police spoke to Villanueva, but he continued to see Mary. Mother called the police "[m]any, many times. Almost once a day or at least once a week," but they did nothing until July 2021.

On July 20, 2021, Mother learned from her youngest daughter that Villanueva was at her house. Mother testified, "I came home from work to my residence and I blocked his exit. He was in [Mary's] bedroom." She called the police and when they arrived about four hours later, Villanueva was still in the bedroom. Mary was fifteen at the time.

During the two years that Mary was involved with Villanueva, Mother saw "very drastic" changes in Mary. According to Mother, Mary "became very

aggressive and she wouldn't allow me to counsel her in any way." Mother testified Mary has been in therapy since 2021, and "[s]ome of her fears went away." But she did not finish her therapy because "she got rebellious and she didn't want to take it anymore." Mary was in therapy again at the time of trial. She was diagnosed with depression, and she was prescribed medicine.

Mother testified that Villanueva's assaults affected her family "[v]ery badly. . . . It has affected us all." There has been disobedience, aggression, and drug use because of Villanueva's relationship with Mary. Once Mary began to see Villanueva, her attitude "changed completely." Mother testified that Villanueva gave drugs to Mary. At the time of trial, Mary had quit high school and Mother did not know whether Mary would return to school.

### 2.    Mary

Mary was seventeen when she testified. She testified she met Villanueva through her brother when she was thirteen. Villanueva got her phone number and they began to talk. Mary said Villanueva knew how old she was, and she knew he was twenty-seven. They did not initially meet in person because Villanueva was living with the mother of his children. Eventually their relationship evolved into what she considered to be a boyfriend-girlfriend relationship. She testified that Villanueva was her first boyfriend and that he told her she was his girlfriend, but they did not go out on dates. Mary told her Mother about the relationship because

4

her Mother "pressed on it and I had to tell her." According to Mary, she tried to tell her Mother that Villanueva was just a friend, but Mother knew she was lying.

Mary testified that her relationship with Villanueva became physical while she still lived in the trailer park. The first time she and Villanueva had sex was in May 2020 in Villanueva's trailer. He sent her a text that he needed help with his daughter. Mary went to his trailer, but he was alone when she arrived. According to Mary, Villanueva told her to take off her shirt and she said no, but he took it off her anyway and they had sex. During their relationship, they had sex in various places, mostly inside a car. There were several videos of them having sex.[4]

Villanueva told Mary "that it was gonna get ugly for him if [she] would say something" about the relationship. Because of therapy, she changed her view on the nature of their relationship. By the time Villanueva was arrested, they had broken up.

Mary testified that she was going to re-enroll in high school and would be in the eleventh grade. She withdrew the year before because she "had a lot of anxiety and depression." She attempted suicide three times since Villanueva's arrest, most recently three months before trial. She testified she is no longer interested in therapy because "[n]one of those things is gonna help" her.

---

[4]     Villanueva confirmed in his testimony that there was at least one instance where a sexual encounter with Mary was recorded.

### 3. Deputy Investigator Albert Munoz

Deputy Investigator Munoz of the Harris County Sheriff's Office investigates child crimes. He was dispatched to Mary's home on July 20, 2021. When he arrived, Villanueva was in the back seat of a patrol car. Deputy Investigator Munoz interviewed Mother, Mary, Villanueva, and Daisy, Mary's younger sister. Deputy Munoz recorded his interview with Villanueva. The jury heard excerpts from the interview, including excerpts where Villanueva admitted to having sex with Mary. According to Deputy Investigator Munoz, Villanueva stated that he first had sex with Mary in May 2020, and that he last had sex with her in June 2021.

### 4. Guadalupe Villanueva

Guadalupe is Villanueva's older sister. She testified that Villanueva is a "good father, attentive, a caretaker" to his three children.

### 5. Angela Villanueva

Angela is Villanueva's younger sister, one of his five siblings. She testified that Villanueva is a brick layer. She testified Villanueva is a father figure to all of his siblings and that he is "always caring" for their mother. She has no reservations about having Villanueva around her young children. She testified she told Villanueva "[t]hat he should be careful with [Mary] because she was just gonna hurt him." She blames Mother in part for Villanueva's legal problems.

6

### 6. Alma Garcia

Garcia is Villanueva's ex-wife.[5] She testified she was married to Villanueva for more than ten years. They have three children, ages fourteen, thirteen, and nine. She testified she was not present when Villanueva had sex with Mary.

Garcia testified Villanueva is "very patient" and "understanding" toward their children and he is a good role model for their children. She testified she has no concerns about Villanueva being around their young daughter.

### 7. Juan Villanueva

Villanueva testified that he and Mary had sex five to ten times between May 2020 and June 2021. He sometimes took her out to lunch or dinner. Although he blames Mary "a little bit" for what happened, Villanueva testified that as an adult, he takes the majority of the blame. He testified he was single when he met her. He looked at his relationship with Mary as "exclusive."

Villanueva and Mary met at the trailer park where they both lived. According to Villanueva, Mary told him she was fourteen or fifteen years old, and he was almost thirty years old.[6] He did not initially feel a connection with Mary but later—after possibly three months—he began to feel a connection and three

---

[5] Garcia and Villanueva were common-law spouses. Garcia testified that they did not get a formal divorce.

[6] Villanueva later conceded that Mary was thirteen when they met and first began to talk.

months after that, he developed feelings for her. He testified that their first sexual experience occurred after Mary moved from the trailer park, about six months after they met. Villanueva testified their relationship was more than just sex because he "care[d] about her and I wanted to always be for her in anything and make sure she does well." He first told Mary to hold off on having sex with him until she was eighteen. He knew it was illegal for them to have sex, but he was following his emotions rather than his head. He was in love with her.

Villanueva testified that Mother never told him not to take her children on outings and that she always knew where they were. According to Villanueva, Mother had called the police about his relationship with Mary and he spoke with the police months before he was arrested. After speaking with the police, he and Mary continued to have sex. According to Villanueva, Mother knew he and Mary were having sex[7] and even after she called the police, Mother continued to allow Villanueva to be around her children.

---

[7]   Villanueva's testimony regarding Mother's knowledge of the relationship was contradictory. He testified that sometimes he and Mary would have sex while Mother was home, but in his recorded statement to the police, he stated Mother did not know about the sex. He testified he told the police Mother did not know about the sex because he did not want to get Mother in trouble, given she had given her approval about the relationship the entire time. He also testified that Mother knew he and Mary were having sex and that while Mother originally approved, at some point she told him to stop.

Villanueva testified that on the day of his arrest, he and Mary were in her bedroom with the door open when Mother came home and found him there. Mother called the police.

When the police arrived, they asked Villanueva about his relationship with Mary. Because he "wanted to end" the relationship, he admitted to having sex with Mary. He testified he wanted to take responsibility for it. He wanted Mary to understand he could not be around her because it was illegal. According to Villanueva, he wanted Mary to understand "that I didn't want to be boyfriend and girlfriend no more. It was just because I seen that it was way too wrong and that— but she would clearly wanted to keep going, keep going and keep going. And I'm like no. You just wait until you're 18 and then we'll talk about it." Villanueva denied telling Mary not to tell anyone about their relationship. He testified he believed the relationship was a positive experience for Mary.

## B.     The Jury Charge and Closing Argument

During the jury charge conference, Villanueva requested that the charge include an instruction stating he is required to register as a sex offender. The State objected, stating it was "adamantly opposed" to such an instruction because the fact Villanueva has to register as a sex offender is "not a consideration for the jury." Shortly after, the following exchange took place:

Defense:            . . . [Lifetime registration as a sex offender] is a
                    consequence he's gonna have to bear and so I

9

would suggest that the jury be informed of it. And I'd also—I'm requesting that I be allowed to mention that during my closing argument. It's a collateral consequence of his conviction. Either probation or prison time.

. . .

State: Just in addition to it not being properly inside the charge, we would just ask that the court make, you know, any rulings in regards to any mention of [sex offender registration] as it's not proper argument outside of punishment. I mean, in punishment at all.

Defense: I don't understand how it can't be proper since it's a consequence of being convicted.

State: Regardless of what outcome of the punishment it is, and it's not proper for any admonishment or any argument to the jury.

. . .

The Court: Okay. And usually those types of admonishments are for the benefit or the purposes of the person, so that they would understand what they are—what their responsibility [is] under the law. And I do believe that without any other guidance, it would be an improper inclusion into the jury charge. As you further—the State point to argument as well?

State: Yes, Your Honor.

. . .

The Court: So I'm going to withhold on the argument because there was a question, which was not objected to, about if anyone in your community or if you would object to anyone in your community having

10

|  |  |
|---|---|
|  | certain sex offender—I'm not stating your question. But there was some question about how would you feel about someone in your community with the sex offender—a conviction or what have you. |
|  | . . . |
| Defense: | And then I'm also asking for the—not so much in the jury charge, although I'd like that to be in the jury charge. I'm also asking for the flexibility to mention that during closing argument. |
| The Court: | Right. I mean, which I was only speaking about closing argument. . . . |

The trial court denied Villanueva's request for a jury instruction on sex offender registration.[8]

The following day, before closing argument began, Villanueva's counsel told the trial court he wanted to question Villanueva about the sex offender registration and to refer to the registration requirement in closing argument:

|  |  |
|---|---|
| Defense: | First Matter. May I make inquiry of my client, since he's going to be testifying? May I ask him about his understanding of the registration requirement. |
| The Court: | Absolutely. |
| Defense: | And second, is may I, in closing argument, mention it? |
| The Court: | Mention that? |

---

[8] Villanueva does not complain on appeal about the omission of an instruction concerning his sex offender registration obligations from the jury charge.

Defense:        That he has a lifetime registration requirement.

State:          We object for the same reasons, Judge. It's an improper jury argument, as well as it is not within the decision making of the jury. It is—it will be error for him to make any argument, as well as the relevancy as well, outside of it just being completely improper.

                . . .

Defense:        . . . [M]ay I mention his lifetime registration requirement during closing argument? Not asking the jury to consider that as a factor in punishment, just to mention that that is a consequence that he has to go through.

The Court:      And the State says, says what?

State:          It's a factor in determining the severity of punishment and this, regardless of whether it's community supervision or prison time, is not a factor. It's for either one of those.

                . . .

Defense:        Judge, the State is making an argument that I wish I could make. The argument that I wish I could make, and I'm not asking for the Court's permission to make this following argument, is that because he has to register for life, therefore he should receive probation or therefore he should receive a lower amount of prison time. And that's not the statement I plan to make to the jury. The statement I plan to make to the jury is that he has to register for life as a reportable conviction. That's the only statement I plan to make to the jury.

12

I'm not saying, well take this into consideration to give him less time, because I understand that would be improper. I'm not asking to do that. I'm just asking to say, has he been convicted. The answer's yes. He pled guilty. That's a reportable conviction. He has a lifetime sex offender registration requirement. Then I'll go on with the rest of my argument to the jury. But that's all I plan to say about lifetime sex offender registration.

. . .

The Court: I mean, ask the question then you all can place it. But I—if—I mean, I'm not really seeing a reason why to not allow that. I haven't heard anything, but I'll—let's hear the question and then approach again.

Defense counsel was allowed to question Villanueva about his sex offender registration obligations without objection from the State. Villanueva testified he understood the jury could recommend probation or it could sentence him anywhere from two to twenty years in prison with a fine of up to $10,000. Villanueva acknowledged he understood that regardless of the punishment assessed, he had to register as a sex offender for life:

Defense: Do you also understand that if the jury recommends probation or if the jury assesses prison time, that you have a lifetime sex offender registration requirement?

Villanueva: I clearly understand that.

There were no other questions or testimony about sex offender registration requirements.

13

Near the end of defense counsel's closing argument, the following occurred:

| | |
|---|---|
| Defense: | Now prison time versus probation. In either case, there's one common factor. Lifetime sex offender registration. |
| State: | I'll object to improper argument, Your Honor. |
| The Court: | And– |
| Defense: | May I continue? |
| The Court: | We'll sustain and keep—continue. |

The trial court did not instruct the jury to disregard defense counsel's argument. Defense counsel continued with the rest of his argument and concluded by asking the jury to sentence Villanueva to ten years' probation. The State requested that the jury sentence Villanueva to prison time.

The jury assessed a sentence of seventeen years' confinement in prison. This appeal ensued.

## Discussion

In one issue, Villanueva argues he was denied his right to counsel when the trial court disallowed his counsel to state the "legal requirement that Villanueva will be required to register for life as a sex offender." He argues the trial court's decision to preclude his counsel from raising the issue during closing argument was an abuse of discretion because his argument "was a correct statement of the law." Villanueva argues that despite the fact the jury assessed Villanueva less than

14

the maximum sentence allowed, harm is demonstrated because "there is a reasonable probability the jury would have assessed an even lower sentence had it been fully and fairly informed of [Villanueva's] sex offender registration requirements."

## A. Standard of Review

We review a trial court's ruling on the State's objections made during jury arguments for abuse of discretion. *Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010)). "The trial court has broad discretion in controlling the scope of closing argument, but it may not prevent defense counsel from making a point essential to the defense." *Id.* (citing *Wilson v. State*, 473 S.W.3d 889, 901–02 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd)). "Counsel is entitled to correctly argue the law, even if the law is not included in the jury charge." *Id.* (citing *State v. Renteria*, 977 S.W.2d 606, 608 (Tex. Crim. App. 1998)).[9] Based on precedent from the Court of Criminal Appeals, we have previously held it is a denial of a defendant's right to counsel if defense counsel is prohibited from

---

[9] Villanueva contends a *de novo* standard of review also applies because "the objected to argument concerns whether a party misstated the law during the jury argument." *See Nzewi v. State*, 359 S.W.3d 829, 841 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) ("We determine *de novo* whether a party misstated the law during jury argument."). We disagree. The State did not identify the basis for its objection during closing argument and Villanueva does not point us to anything in the record where his sex offender registration requirement is referred to as a misstatement of the law.

making a jury argument he is entitled to make. *Id.* (citing *Wilson*, 473 S.W.3d at 901–02). Yet, neither party may utilize closing argument "as a vehicle to place before the jury evidence that is outside the record." *Id.*

## B.      Preservation of Error

The State contends Villanueva did not preserve error for his argument that he was prohibited "from arguing the consequences of becoming a sex offender [because] his argument was a correct statement of the law." The State's argument is two-fold. It first argues that when the prosecutor objected to Villanueva's closing argument based on "improper argument," Villanueva's counsel merely stated, "May I continue," without further argument or support for its legal contention. Thus, according to the State, Villanueva abandoned his argument or failed to preserve it. Second, the State argues that even if Villanueva preserved argument, it did so only for his argument on appeal that he should have been allowed to state the fact he would have to register as a sex offender for life, but not with respect to any argument he should have been allowed to discuss the ramifications of becoming a sex offender. The State argues there is nothing "in the record to indicate that trial counsel intended to argue anything of the sort." Nor is there an offer of proof reflecting what, if anything, Villanueva would have argued "about the consequences of sex offender registration."

Villanueva responds he adequately preserved error because the judge "understood the purpose of discussing [the sex offender registration requirement] in the punishment argument" based on defense counsel's exchange with the court during the charge conference and the following day before closing arguments. He argues he was "prohibited from delivering" a closing statement that tracked the language in Article 62 of the Texas Code of Criminal Procedure regarding sex offender registration.

Texas Rule of Appellate Procedure 33.1 provides that a complaint is preserved for appellate review if the record shows:

(1)    the complaint was made to the trial court by a timely request, objection, or motion that:

    (A)    stated the grounds for the ruling that the complaining party sought from the trial court *with sufficient specificity to make the trial court aware of the complaint*, unless the specific grounds were apparent from the context; and

    (B)    complied with the requirements of the Texas Rules of Evidence or the Texas Rules of Civil or Appellate Procedure; and

(2)    the trial court:

    (A)    ruled on the request, objection, or motion, either expressly or implicitly . . . .

TEX. R. APP. P. 33.1(a). (Emphasis added.)

During his exchange with the trial court, Villanueva's counsel told the trial court judge that the "only statement [he] plan[ned] to make to the jury" during

17

closing argument was that Villanueva had "to register for life as a reportable conviction." Villanueva's counsel stated:

> The argument that I wish I could make, and I'm not asking for the Court's permission to make this following argument, is that because he has to register for life, therefore he should receive probation or therefore he should receive a lower amount of prison time. And that's not the statement I plan to make to the jury. *The statement I plan to make to the jury is that he has to register for life as a reportable conviction. That's the only statement I plan to make to the jury.*
>
> I'm not saying, well take this into consideration to give him less time, because I understand that would be improper. I'm not asking to do that. I'm just asking to say, has he been convicted. The answer's yes. He pled guilty. That's a reportable conviction. He has a lifetime sex offender registration requirement. Then I'll go on with the rest of my argument to the jury. *But that's all I plan to say about lifetime sex offender registration.*

(Emphasis added.) During closing argument, Villanueva's counsel stated, "Now prison time versus probation. In either case, there's one common factor. Lifetime sex offender registration." The State objected based on "improper argument" and the trial court sustained the objection. Thus, to the extent Villanueva argues on appeal he was entitled to discuss the fact he was required to register as a sex offender during his closing argument, we hold he preserved error. But with respect to his argument that he was entitled to discuss the consequences flowing from such registration, Villanueva never made that argument to the trial court. We thus hold he did not preserve the issue for our review. As his counsel clarified to the trial

18

court, "the only statement [he] plan[ned] to make to the jury" was "that he has to register for life."

Villanueva does not point to any place in the record, and we have not found any, where he made the trial court aware he intended to argue the ramifications of his sex offender registration obligations. Nor did he make an offer of proof stating what, if anything, he would have argued to the jury regarding any such ramifications.[10] "The issue of whether a trial court improperly denied a defendant the right to make a closing argument in violation of the constitutional right to counsel cannot be preserved for appellate review where the record does not fully demonstrate to an appellate court what counsel would have argued but for an objection." *Joiner v. State*, No. 08-18-00118-CR, 2020 WL 4696625, at *16 (Tex. App.—El Paso Aug. 13, 2020, pet. ref'd) (not designated for publication); *see also Price v. State*, 870 S.W.2d 205, 209 (Tex. App.—Fort Worth 1994) (holding error not preserved "[w]here the record does not fully demonstrate to the reviewing

---

[10]     Villanueva argues that the exchange between his defense counsel and the trial court concerning the jury charge informed the trial court of the degree to which he planned to discuss the sex offender registration requirement in closing argument. Defense counsel told the trial court that lifetime registration as a sex offender "is a consequence he's gonna have to bear and so I would suggest that the jury be informed of it. And I'd also—I'm requesting that I be allowed to mention that during my closing argument." We do not interpret defense counsel's statement as advising the trial court that Villanueva sought anything other than to mention to the jury that Villanueva had to comply with the sex offender registration requirement. The specific details of the registration requirements were not discussed or contemplated by this exchange.

19

court what counsel would have argued but for an objection"), *aff'd*, 887 S.W.2d 949 (Tex. Crim. App. 1994); *Frias v. State*, No. 08-13-000325-CR, 2019 WL 101935, at *7 (Tex. App.—El Paso Jan. 4, 2019, pet. ref'd) (not designated for publication) ("Where the record does not fully demonstrate to the court what counsel would have argued but for an objection, and a party did not make an objection to the trial court's ruling, no demonstration of harmful error is made, and the issue is not preserved for appellate review."); *Joiner*, 2020 WL 4696625, at *16 ("Although defense counsel . . . offered a thorough explanation of why he believed that his argument was proper, counsel did not make a showing on the record of what he would have argued but for the trial court's ruling. For this reason, this issue is not properly preserved for appellate review.").

We thus hold that while Villanueva preserved his argument that the trial court abused its discretion and denied him his right to counsel by disallowing him to discuss the fact of his sex offender registration obligations during closing argument, he did not preserve his argument on appeal concerning his right to discuss the consequences or ramifications of his sex offender registration requirements.

## C. The Ruling

Villanueva argues the trial court abused its discretion and denied his right to counsel by precluding him from stating during closing argument the "legal

requirement that Villanueva will be required to register for life as a sex offender," which Villanueva contends is a correct statement of the law. The State responds that even assuming the trial court committed error, Villanueva was not harmed.

We start by deciding whether the trial court abused its discretion in sustaining the State's objection to Villanueva's closing argument. Defense counsel may not be precluded from making a closing argument he has a right to make. *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989); *see also Davis*, 329 S.W.3d at 825 ("Although we have held that improper denial of a jury argument may constitute a denial of the right to counsel, this holding assumes that the jury argument is one the defendant is entitled to make."). Villanueva argues he was entitled to tell the jury that in light of his conviction, he would have to register for life as a sex offender because the statement is a correct statement of the law. He cites to Chapter 62 of the Code of Criminal Procedure[11] governing the registration of sex offenders, and to our holding in *Vasquez v. State*, 484 S.W.3d 526 (Tex. App.—Houston [1st Dist.] 2016, no pet.) for support.

In *Vazquez*, we held the trial court abused its discretion by not permitting defense counsel to discuss the legal registration requirements for convicted sex

---

[11] *See* TEX. CODE CRIM. PROC. art. 62.001(5)(A) (defining "reportable conviction or adjudication" to include conviction or adjudication for or based on sexual assault); 62.001(6)(A) (defining "sexually violent offense" to include "sexual assault"); 62.101(a)(1) (explaining that person with reportable conviction or adjudication for sexually violent offense has lifetime duty to register as sex offender).

offenders during closing arguments in the punishment phase.[12]  *Id.* at 531.  The defendant in *Vasquez* was convicted of sexual assault and sentenced to seventeen years in prison.  *Id.* at 528.  Vasquez argued on appeal that the trial court abused its discretion by preventing him during closing argument from "discussing the legal registration requirements for convicted sex offenders[.]"  *Id.*

During closing argument, Vasquez's counsel attempted to describe the sex offender registration requirements:

| | |
|---|---|
| Defense: | What does it mean to get convicted on a sexual assault case? What does it mean to [Vasquez] even before you assess punishment in this case? It means a lifetime of registration as a sexual offender, basically until the day he dies. Every time he moves houses, he will be required to register—pre-register seven days before. |
| The State: | Objection, Your Honor. This is all facts not in evidence. |
| The Court: | Sustained. Please stay within the evidence. |
| Defense: | Sexual registration will also require— |
| The State: | Objection, Your Honor, this is facts not in evidence. |
| The Court: | Sustained. |

---

[12]  We ultimately concluded, however, that the error was harmless.  *Vasquez v. State*, 484 S.W.3d 526, 532 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("Because Vasquez's counsel conveyed to the jury the substantive argument that Vasquez would be subject to sex offender registration requirements, we conclude beyond a reasonable doubt that he was not harmed by the trial court's rulings.")

Defense:        Employers do not hire sex offenders.

The State:      Objection, Your Honor, facts not in evidence.

Defense:        Your Honor—

The Court:      Overruled. I'll allow it.

Defense:        Thank you, sir.

Defense:        He will not be employable. He will have to find another way of making a living once he gets out of jail.

                The prosecutors will argue that [the complainant's] life will never be the same. I submit to you, ladies and gentlemen, neither will [Vasquez's]. He will be labeled like a sex offender and be treated as one as long as he lives. Sex offenses are considered extremely serious offenses by the parole board. In my experience, he will pretty much have to serve out—

The State:      Objection, Your Honor—

Defense:        —the sentence you give him.

The State:      —improper argument.

The Court:      Sustained.

*Id.* at 530. Vasquez's counsel concluded her closing argument "by asking the jury to consider that Vasquez would have to register as a sex offender." *Id.* The State did not object to that comment. *Id.*

After closing argument, Vasquez's counsel made an offer of proof regarding her "intended closing argument:"

23

Being a sex offender essentially means lifetime registration, basically until the day he dies. Every time he moves residences, he would be required to register. Before he moves—seven days before he moves and seven days after the move. If he were to go somewhere for two days in three months, he has to report to the authorities of that city and county as well. And failure to comply with the registration requirements is another felony. And depending on the circumstances of that particular case, the range of punishment can be anywhere between 180 days to 20 years in prison for each violation.

Once he registers, the police will automatically be provided with his sex offender status upon request when they run a check on his driver's license or his license plate.

Additionally, the Texas Attorney General's Office authorizes local governments to broadcast information about registration of sex offenders to local cable television because it's public information. His name will also be on the Internet as a registered sex offender.

*Id.* at 530–31. The State conceded the offer of proof was "legally accurate." *Id.* at 531.

In concluding the trial court abused its discretion in disallowing Vazquez to discuss the legal requirements for sex offender registration, we observed that Vasquez's status as a sex offender was "public record" and that "[a]s a correct and relevant statement of the law, Vasquez's argument should have been permitted." *Id.*[13] We held that "[t]o the extent that Vasquez's remarks in closing argument discussed and applied the law applicable to convicted sex offenders, as his offer of proof did, the trial court should have allowed them." *Id.*

---

[13]    We held, however, that the trial court "properly excluded . . . counsel's comments that sex offenders are less likely to be released on parole than other offenders because it was argument outside the record." *Vasquez*, 484 S.W.3d at 531.

Like Vasquez, Villanueva tried to make a "correct and relevant statement of the law" during his closing argument—that he would have to register as a sex offender for life given his conviction. *Id.* Because defense counsel's statement was a correct statement of the law, we hold the trial court abused its discretion in sustaining the State's objection. *See id*; *see also Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.). (holding trial court erred in preventing defense counsel from arguing "legitimate inference" from evidence or lack thereof of appellant's blood-alcohol level at time of accident); *cf. Renteria*, 977 S.W.2d at 608 ("[T]here is no error in correctly arguing the law . . . .").

We must now consider whether the error resulted in harm.

**D.    Harm**

The parties differ as to which standard of harm applies. Villanueva argues the constitutional standard contemplated by Texas Rule of Appellate Procedure 44.2(a) applies, while the State argues the non-constitutional standard identified in Rule 44.2(b) is the correct standard.[14]  *See* TEX. R. APP. P. 44.2 (setting forth

---

[14]    The State's position is premised on its argument that even if the trial court erred by sustaining its objection, Villanueva was not denied his right to counsel. The State challenges our holding in *Vasquez v. State*, and the holding of the El Paso Court of Appeals in *Lemos v. State*, that the "improper denial of jury argument that defense is entitled to make [denies the defendant of his] right to counsel." *See Vasquez v. State*, 484 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (holding defendant was denied right to counsel when trial court disallowed jury argument regarding sex offender registration requirements, but finding error was harmless); *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.) (holding defendant was denied right to counsel when his counsel was

standards for constitutional and non-constitutional harm). We hold the stricter constitutional error standard applies. *See Vasquez*, 484 S.W.3d at 532 ("Because a trial court's improper denial of a jury argument counsel is permitted to make is a denial of the right to counsel, it is constitutional error, subject to harm analysis under Rule of Appellate Procedure 44.2(a).") (citations omitted); *Wilson*, 473 S.W.3d at 902 ("Denial of the right to counsel is an error of constitutional magnitude.") (citing U.S. CONST. amend. VI; TEX. CONST. art. I, § 10). Using that standard, we must reverse "unless we determine beyond a reasonable doubt that the error did not contribute" to Villanueva's sentence. *Lemos*, 130 S.W.3d at 893. The primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction or punishment. *See Wilson*, 473 S.W.3d at 902 (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)); *see also* TEX. R. APP. P. 44.2(a) (reversal is required "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

In conducting our harmless error analysis, we do not focus on the propriety of the outcome of trial, but instead "calculate as much as possible the probable

---

prevented from arguing defendant's blood-alcohol level may have been rising, rather than falling, between time of collision and time of breath test). The State posits that *Vazquez* and *Lemos* "were incorrect about this proposition," but it also acknowledges that the "relevant controlling authority from the Court of Criminal Appeals runs contrary, and [that] this Court is ultimately bound" by such controlling authority.

26

impact of the error on the jury in light of the existence of other evidence." *Vasquez*, 484 S.W.3d at 532 (quoting *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)). We evaluate the record "in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution." *Id.* (citing *Cantu v. State*, 395 S.W.3d 202, 211 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd)). We consider "the nature of the error, the extent to which it was emphasized by the State, its collateral implications, and the weight a jury would likely assign it." *Id.* (citing *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. App. 2011)).[15] "These factors are not exclusive, and other considerations may inform our harm analysis." *Id.* (citing *Cantu*, 395 S.W.3d at 211). In short, in determining whether constitutional error is harmless, we "take into account any and every circumstance apparent in the record that logically informs an appellate determination whether beyond a reasonable doubt" the error "did not contribute to the conviction or punishment." *Id.* (internal quotation marks omitted).

Villanueva argues he was harmed because the trial court's ruling prevented the jury "from knowing and considering that the sex offender registration requirements Villanueva was subject to would act as a further protection for the community." He contends he was not allowed to argue that "the legislature has

---

[15] Not every factor applies to every constitutional harm analysis. *Bailey v. State*, No. 01-15-00215-CR, 2016 WL 921747, at *11 (Tex. App.—Houston [1st Dist.] Mar. 10, 2016, no pet.) (mem. op., not designated for publication) (citing *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011)).

laws that provide public safety" to counter the State's argument that Villanueva would be "dangerous" for the community. According to Villanueva, the jury was left with "the false impression that the only way it could protect the community was to sentence Villanueva to a lengthy prison term." Villanueva argues there is "reasonable doubt that had the jury been informed of the sex offender registration requirements," the jury would have assessed a lesser punishment.[16]

Villanueva's harm analysis is premised in part on arguments he did not preserve for appeal. Villanueva told the trial court that the "only statement [he] plan[ned] to make to the jury" during closing argument was that he had "to register for life as a reportable conviction." As we have already held, Villanueva did not preserve any issue concerning his ability to discuss the legal ramifications of his sex offender registration obligations nor did he argue to the trial court or make any offer of proof concerning any such consequences or concerns about public safety. We thus limit our harm analysis to the trial court's ruling on the State's objection to the statement Villanueva had to register for life as a sex offender.

---

[16] Contrary to Villanueva's contention, the State did not ask the jury to assess the maximum sentence. The State argued during closing arguments, "[T]his may be a maximum case in your mind. I will leave that up to you, I'm not gonna give you guys a number. But as far as the circumstances, of again multiple times, the age difference, this could very well a [sic] maximum case in your mind. I'll leave that to you guys." The State argued that the punishment be prison time rather than probation.

"In evaluating whether a defendant was harmed by the trial court's exclusion of the defendant's argument, an appellate court may consider the extent to which the defendant communicated his argument despite the trial court's rulings." *Vasquez*, 484 S.W.3d at 532–33.

The State argues Villanueva was not harmed by the trial court's ruling on its objection because the jury was not instructed to disregard his counsel's statement in closing argument that he would be required, regardless of the punishment assessed, to register as a sex offender for life. It argues that absent an instruction to disregard, "the jury was left to consider trial counsel's argument." We agree.

Villanueva's counsel conveyed to the jury, both during his direct examination of Villanueva and during closing argument, the substantive argument that Villanueva would be subject to sex offender registration requirements, regardless of any imposed sentence. The State did not object when defense counsel asked Villanueva about his sex offender registration obligations, and even though the trial court sustained the State's objection to his defense counsel's closing argument, the trial court did not instruct the jury to disregard the statement. The jury was thus left at liberty to consider the objected-to argument and Villanueva's unobjected testimony. *See Wiltz v. State*, 827 S.W.2d 372, 374 (Tex. App.—Houston [1st Dist.] 1992) (holding trial court's error in sustaining objection to closing argument did not cause harm because "the trial court merely sustained

29

the State's objection, and did not instruct the jury to disregard appellant's counsel's argument"), *rev'd on other grounds*, 863 S.W.2d 463 (Tex. Crim. App. 1993); *Wilson*, 473 S.W.3d at 902–03 (holding any error committed by trial court in sustaining State's objection during closing argument was harmless because objection was made after argument and jury was not instructed to disregard); *cf. Thornton v. State*, 425 S.W.3d 289, 305 n.82 (Tex. Crim. App. 2014) (observing when appellant objected to leading question but did not ask trial court for instruction to disregard response, "the jury would not have known to disregard the testimony and would not have acted improperly in considering it as evidence during its deliberation").

The factors we discussed in *Vasquez* also point toward a finding of no harm. *See Vazquez*, 484 S.W.3d at 532 (listing non-exclusive factors for constitutional harm analysis). First, the nature of the error was the trial court's ruling on the State's "improper argument" objection to defense counsel's argument, but the non-specific objection was made after defense counsel elicited testimony, without objection, from Villanueva about the same matter, and after defense counsel had already made the argument to the jury. Second, the error was not emphasized by the State. *See Whitehead v. State*, 437 S.W.3d 547, 553 (Tex. App.–Texarkana 2014, pet. ref'd) ("Because the State did not emphasize the error or seek to benefit from it, this factor weighs in favor of a finding that the error was not harmful.").

30

Third, any collateral implications from the trial court's ruling were negated by the trial court's failure to instruct the jury to disregard defense counsel's argument, leaving the jury at liberty to consider defense counsel's comment and Villanueva's testimony. *See Enos v. State*, 909 S.W.2d 293, 296 (Tex. App.—Fort Worth 1995, pet. dism'd) (noting collateral implication analysis "contemplates issues like the . . . error's impact on sentencing"). And last, given that Villanueva's statement to the jury during closing argument reflected the sum total of what he intended to argue to the jury—as he made clear in his arguments to the court prior to his argument—there is no reason to believe a jury would have assessed a lighter sentence had the objection been overruled. The jury had already heard testimony about Villanueva's sex offender registration obligations and even then, still opted to assess a seventeen-year prison sentence.

All four factors weigh in favor of a harmless error finding. *See Vazquez*, 484 S.W.3d at 532 (holding that because defense counsel conveyed to jury substantive argument the defendant would be subject to sex offender registration, defendant was not harmed by trial court's ruling); *Radilla-Esquivel v. State*, No. 03-14-00544-CR, 2016 WL 4978565, at *14 (Tex. App.—Austin Sept. 16, 2016, pet. ref'd) (mem. op., not designated for publication) (holding in constitutional harm analysis that ruling sustaining State's objection to jury argument was

31

harmless because trial court did not instruct jury to disregard argument after objection and testimony was elicited regarding substance of same argument).

We overrule Villanueva's sole issue.

## Conclusion

We affirm the trial court's judgment.



                            Veronica Rivas-Molloy
                            Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).